**ALAFOSS, h. f., Appellant,**

v.

**PREMIUM CORPORATION OF AMERICA, INC., Appellee.**

No. 78–1381.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1978.

Decided May 7, 1979.

Rehearing and Rehearing En Banc Denied June 6, 1979.

J. Patrick McDavitt of Levitt, Palmer, Bowen, Bearman & Rotman, Minneapolis, Minn. (argued), and Joel H. Gottesman, Minneapolis, Minn., on brief, for appellee.

Before GIBSON, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Alafoss, h. f., an Icelandic corporation, appeals from a judgment of the district court in favor of the Premium Corporation of America, Inc. (PCA), because of Alafoss' breach of contractual warranties. Alafoss brought this action against PCA for the balance due on a contract for the sale of ladies' white wrap coats to PCA. PCA admitted its liability on the contract but brought a counterclaim for damages for breach of warranties by Alafoss. The district court awarded PCA a net judgment in the amount of $133,275.86, together with costs and interest.

Alafoss raises the following issues on appeal:

    1) The district court erred in permitting PCA to bring an action for breach of warranty after PCA had accepted the goods by reselling them;

    2) The district court erred in finding that Alafoss failed in its efforts to cure the nonconformities;

    3) The district court erred in failing to give appropriate significance to PCA customers' letters which allegedly demonstrated that most coats were returned to PCA for reasons other than defects in the coats attributable to Alafoss; and

    4) The district court's damage award was contrary to the evidence and to applicable statutory law.

We find no merit in Alafoss' first three allegations, and we affirm the decision of the district court holding Alafoss liable on PCA's counterclaim. However, we believe the trial court erred in its assessment of damages. Accordingly, we remand the case to the district court for a redetermination of damages consistent with this opinion.

P. Sveinbjorn Johnson of Head, Johnson, Martin & Parizek, Chicago, Ill. (argued), Michael K. Shannon, Chicago, Ill., and Robert W. Gislason of Gislason & Martin, Minneapolis, Minn., on brief, for appellant.

## I. *Factual Background.*

In the summer of 1972, Alafoss, h. f., an Icelandic corporation engaged in the sale and export of garments made from the fur and wool of Icelandic sheep, supplied PCA, a Minnesota corporation engaged in a variety of business ventures, including mail sales programs, with samples of ladies' wrap-around coats (hereafter "wrap coats"). The bodies of these sample coats were of white wool, and the coats' detachable, solid white fur collars exhibited a full, silky texture. PCA approved these samples, and Alafoss informed PCA representatives that it could furnish coats conforming to the samples in the quantity required for a PCA mail-marketing program aimed at American Express cardholders.

PCA purchased 750 wrap coats from Alafoss and conducted a test marketing. The fur collars on the test coats were solid white with a full, silky texture, conforming to the samples.

In January 1973, the interested parties—PCA, Icelandic Imports, a New York corporation serving as agent for Alafoss, and American Express—entered into a written agreement whose terms called for a full-scale mail-marketing promotion of the Alafoss-manufactured wrap coat, to begin in the autumn of 1973. The agreement incorporated a copy of the sales brochure to be used in the mail-marketing of the coats, representing the color and texture of the coats' fur collars as identical to those of the sample coats.

In February 1973, Alafoss contracted to sell PCA at least 7,200 wrap coats.[1] The agreement contained an express warranty that the coats would conform to the color and quality of the sample wrap coats.

PCA issued one purchase order to Alafoss for 7,200 wrap coats on March 9, 1973, and another order on October 10, 1973, for 1,025 additional coats. The purchase orders provided that Alafoss guaranteed the wrap coats were "fit * * * for the purpose for which such merchandise is intended to be used." PCA relied on Alafoss to select and ship wrap coats conforming to the sample approved by PCA. During August-September 1973, PCA mailed the sales brochure for the wrap coats to over 3,000,000 American Express cardholders.[2]

Alafoss delivered the wrap coats in the spring and summer of 1973. In October 1973, PCA discovered irregularities in the wrap coats remaining in their stock. A number of the fur collars were discolored, and some of the coats had loosely-sewn pockets. After discussing the nonconformities with representatives from Alafoss, the parties agreed that the collars on the approximately 4,350 coats not conforming to sample should be detached and sent to Mademoiselle Furs, a New York furrier, for treatment. Alafoss agreed to bear the price of treatment, which amounted to $24,186.90, plus an additional $2,800 expense for sewing the loose pockets.

The furrier treatment initially appeared to remedy the irregularities in the collars, and PCA used coats with such treated collars to fill some customers' orders. However, by early 1974, customers had returned a number of wrap coats with yellow and ragged collars. All of the collars on the returned coats were similar in appearance, whether or not they had been treated by Mademoiselle Furs.[3]

In January 1974, PCA again apprised Alafoss that coats in its possession were nonconforming because of discolored collars. In mid-March 1974, approximately 4,000 nonconforming coats remained in PCA's possession.

---

1. The agreement called for the sale of 7,200 coats, with Alafoss holding an additional 1,800 coats in reserve for a later order by PCA.

2. PCA offered the coat in its mail-marketing program for $199.90, plus $3.95 for shipping and handling. PCA paid $88.11 per coat, including shipping charges.

3. Collars treated by Mademoiselle Furs could be identified by a yellow gummed dot that had been placed in the lining of each treated collar before delivery of the coat to customers.

On June 12, 1974, after attempting to sell its stock of leftover wrap coats, PCA sent Alafoss a letter stating that

> because of these defects and discoloration, the best offer we have been able to obtain after a substantial effort on our part is $25 per coat. Please be advised that unless you advise us of an acceptable offer of a higher price by June 17, 1974, we intend to accept this offer.

PCA sold 3,736 wrap coats to Alden's Inc. for $71,740 (approximately $20 per coat).

Alafoss brought this action in May 1974, seeking recovery from PCA of $132,474 for unpaid wrap coats. PCA counterclaimed for $350,000 in damages allegedly resulting from Alafoss' breach of its warranties of conformity to sample and of fitness for a particular purpose.

The district court, sitting without a jury, held that Alafoss breached such warranties and ordered that a net judgment be entered for PCA in the amount of $133,275.86, plus costs.

II. *Discussion.*

A. *Acceptance/Rejection Issue.*

Alafoss claims that PCA cannot bring an action for damages because PCA's resale of the wrap coats constituted an "acceptance" of the goods and statutorily precludes PCA from subsequently rejecting them and suing Alafoss for breach of warranty. In addition, Alafoss contends that PCA never effectively revoked its acceptance of the wrap coats.

■ Alafoss' argument misapprehends Minnesota's version of the Uniform Commercial Code relating to acceptance of goods by a buyer, which, in pertinent part, reads:

4. Minn.Stat.Ann. § 336.2–714(1) provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of section 336.2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured *but acceptance does not of itself impair any other remedy provided by this article for nonconformity.* [Minn.Stat.Ann. § 336.2–607(2) (1966) (emphasis added).]

PCA does not dispute that, under this statute, its resale of nonconforming wrap coats constituted acceptance of such coats. That acceptance, unless made under the reasonable assumption that the nonconformities would be cured, barred subsequent rejection of the coats. However, the statute plainly indicates that such acceptance does not bar PCA from pursuing remedies, other than rejection of the goods, "provided by this article for nonconformity." Minn.Stat.Ann. § 336.2–607(2), *supra.* Assuming that, as Alafoss contends, PCA irrevocably accepted the wrap coats, PCA was nonetheless entitled to sue Alafoss for breach of warranties, under Minn.Stat.Ann. § 336.2–714(1) (1966), so long as it gave Alafoss the notification of breach required by the statute.[4]

■ The applicable notice requirement is contained in Minn.Stat.Ann. § 336.2–607(3) (1966), which reads:

(3) Where a tender has been accepted

> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]

Alafoss does not claim that PCA failed to notify it of irregularities in the coats within a reasonable time after discovery of the defects, and the record indicates that PCA gave Alafoss ample notice of such defects.[5]

5. The type of notification required to preserve PCA's right to a remedy for Alafoss' breach need not be an explicit statement of all its objections to the goods. "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." U.C.C. Comment to Minn.Stat.Ann. § 336.2–607 at 550 ¶ 4.

Consequently, PCA retained its right to a remedy for breach of warranties notwithstanding its irrevocable acceptance of the coats by reselling them to its customers, and the record does not establish such acceptance as a basis for rejection of PCA's counterclaim.

### B. The Attempted Cure.

■ Alafoss claims that no inherent nonconformities resulted from its manufacture of the coats and that the district court erred by overlooking the significance of the treatment of the collars by the furrier, i. e., that brushing and proper care of the collars made the coats appear as warranted.

The district court found that the treatment of the collars by the furrier only temporarily improved their appearance. Because treatment of the fur did not remedy the nonconformities in the collars, the court held that Alafoss breached its warranties of conformity to sample and fitness for a particular purpose and use.[6] We agree with that determination.

The evidence adduced at trial established that, instead of the warranted solid-white fur collars with a full, silky texture, a large number of the collars delivered to PCA were yellowish and ragged looking. Although PCA employees attempted to remedy the defects in various ways—for example, by shielding the collars from potentially harmful lighting in the storage warehouse and by steaming and brushing them—the discoloration and ragged appearance remained.

Eventually, the parties decided to have the collars professionally treated. The precise nature of the remedial procedures employed by Mademoiselle Furs was never revealed. Apparently, the furrier combed, steamed, and sprayed the collars with some type of solution. Harold Schwartz, president of Mademoiselle Furs, testified that he did not know how long the effects of his company's treatment of the furs would endure. In addition, Julius Masow, a fur expert, testified that no amount of brushing of the defective collars would do anything more than temporarily improve their scrawny appearance and discoloration. In any event, treated collars later returned by customers showed the same defects as collars on coats which had not been treated.

In sum, the evidence establishes that the defects in the wrap coats were not caused by PCA's handling of the goods and that proper care and brushing only temporarily enhanced the appearance of the coats. Thus, the record supports the district court's finding that the treatment of the defective fur failed to remedy the nonconformities in the collars' appearance and the court's conclusion that Alafoss breached its express warranty of conformity to sample and its express and implied warranties of fitness for a particular purpose.

### C. The Customers' Letters Issue.

As part of its argument that no breach of contract was established, Alafoss contends that customers' letters accompanying coats returned to PCA overwhelmingly reflected dissatisfaction with size, not with the collars or pockets. Alafoss therefore urges that PCA did not meet its burden of proving that merchandise was returned because of defects in the coats attributable to Alafoss.[7]

---

The record shows that PCA issued purchase orders in March and October 1973 for a total of more than 8,000 coats to be delivered by autumn 1973. PCA first notified Alafoss' representatives in October 1973 of defects in the delivered coats. In January 1974, after an attempted cure of the nonconformities failed, and after customers returned a large number of the wrap coats with yellow and ragged collars, PCA informed Alafoss that the same problems with the coats had recurred.

6. The district court found that Alafoss expressly warranted that the coats it supplied to PCA would conform to the sample coats it displayed in July 1972, and guaranteed that the coats were fit for PCA's resale purposes, i. e., appeared as represented in PCA's mailing brochure.

7. Alafoss relies upon Minn.Stat.Ann. § 336.2–607, which provides in pertinent part:

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

■ The district court's determination that Alafoss breached its warranties to PCA is based upon findings that the wrap coats provided by Alafoss failed to conform to sample and were unfit for PCA's resale purpose. Whether such nonconformities proximately caused PCA customers to return coats is of no relevance to whether a breach of contract existed. However, Alafoss' contention that the customers' letters indicate the lack of a causal connection between Alafoss' breach and the return of coats by PCA customers is highly relevant to whether PCA adequately proved its damages, the issue to which we now turn.

D. *Damages.*

The legal standard for determining PCA's damages in this case is set forth in Minn.Stat.Ann. § 336.2–714(2), which provides:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

In applying that standard, the district court took the unit cost of the wrap coats to PCA, $88.11, as the value of each coat as warranted, at the time and place of acceptance. The court determined the actual value of each nonconforming coat at the time and place of acceptance to be $25.[8] The court then calculated PCA's damages from the breach by multiplying both unit values by 3,736, the number of nonconforming coats left over after the sales program ended, and subtracting the total value of the coats as accepted from the value they would have possessed if they had been as warranted. The resulting difference amounted to $238,758.96.[9]

■ In calculating the damage PCA sustained because of the nonconforming coats in the above manner, the district court appears to have overlooked certain "special circumstances show[ing] proximate damages of a different amount." Minn.Stat. Ann. § 336.2–714(2), *supra.* First, evidence introduced at trial indicates that PCA anticipated that, even if all of the wrap coats conformed to sample, it would be unable to sell somewhere between twenty-five and fifty percent of the coats during the mail-marketing program.[10] Such "normal leftover: coats would have been sold in bulk at a price less than cost, precisely as PCA did here with the leftover nonconforming coats.[11] To the extent that such normal leftover coats would have existed in the absence of any breach by Alafoss, the proper measure of damages proximately caused by Alafoss' breach is the difference between the value of leftover conforming coats if sold in bulk and the value of the nonconforming coats sold in bulk.

■ Second, because the nonconformities for which Alafoss is responsible may have

8. The district court determined that the evidence adduced at trial established that $25 per coat, rather than the approximately $20 PCA actually received, was a fair sales price for the leftover nonconforming coats.

   Alafoss does not dispute on this appeal that $25 was a fair bulk sale price for the coats in their actual condition if sold within a commercially reasonable time after discovery of the breach.

9. The net judgment of $133,275.86 against Alafoss was computed as follows: To the $238,758.96 in damages for Alafoss' breach of warranties, the district court added $26,986.90 incidental damages, representing the cost to PCA of treating the nonconformities. From that sum, the court subtracted $132,470, the amount PCA owed Alafoss on the purchase price of the coats. Neither PCA's incidental damages nor

Alafoss' entitlement to the purchase price is at issue on this appeal.

10. In addition, the district court found that the evidence failed to establish "that a rerun of the wrap coat promotion would have been successful even if the remaining wrap coats had conformed to the samples[.]"

11. The 3,736 nonconforming coats remaining in PCA's possession at the conclusion of its marketing program, and thereafter sold in bulk to Alden's at $20 per coat, amounted to approximately 44 percent of the total number of coats ordered by PCA from Alafoss. That figure falls within the 25–50 percent of the coats which PCA anticipated it would be unable to sell during the program.

caused more coats to be left over than would have been the case absent the breach, the district court should have distinguished between the number of coats that would normally have been left over and the number of additional coats left over due to the nonconformities. As to those additional leftover coats (but not as to the coats that would have been left over even if no breach existed), the proper measure of damages is that applied by the district court to all coats—that is, at the time and place of acceptance, the difference between the value of the coats if they had been as warranted and the coats' value as actually delivered.

Thus, the proper computation of PCA's damages proximately resulting from Alafoss' breach requires, in addition to the findings already made by the district court, a determination of (1) the number of coats that would have been left over absent any breach, and (2) the value of those normal leftover coats. The record as it stands does not reveal those quantities. We note, however, that the PCA customers' letters referred to above, indicating that coats were returned by customers for reasons other than the nonconformities attributable to Alafoss, constitute strong evidence that such returned coats would have been left over even if Alafoss had complied fully with the terms of the sales agreement. Therefore, the damage award should be substantially reduced to reflect the actual loss PCA sustained for coats that would have been left over regardless of the breach.

Accordingly, we affirm the district court's determination of Alafoss' liability for breach of warranties, but we reverse the damage award and remand the case for reconsideration of damages consistent with this opinion.[12] The trial court at its option may receive additional evidence on the damage issue.

---

12. We allow Alafoss to tax 50 percent of its costs on this appeal.