**GOULD INCORPORATED, Petitioner,**

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent,**

**James Moran, Intervenor.**

**No. 78–2220.**

United States Court of Appeals, Third Circuit.

Argued Aug. 8, 1979.

Decided Dec. 27, 1979.

As Amended March 13, 1980.

John Markle, Jr., Mark M. Wilcox, Drinker, Biddle & Reath, Philadelphia, Pa., for petitioner.

Marjorie S. Gofreed, Alan Banov, N. L. R. B., Washington, D. C., for respondent.

David Kairys, Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for intervenor.

Before ALDISERT and WEIS, Circuit Judges, and DIAMOND, District Judge *.

## OPINION OF THE COURT

DIAMOND, District Judge:

Gould, Inc. (Gould) has petitioned for review of an order of the National Labor Relations Board (Board) in which it held that Gould committed unfair labor practices in violation of §§ 8(a)(1), (3), (4) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1), (3), (4),[1] when Gould discharged an employee for disciplinary reasons. The Board has filed a cross petition for the enforcement of that order. We have jurisdiction under §§ 10(e), (f) of the Act, 29 U.S.C. §§ 160(e), (f).

■ The principal question which we must decide is whether it was an unfair labor practice for the employer to single out for disciplinary discharge a union steward

* Honorable Gustave Diamond, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. The pertinent parts of those Sections of the Act provide:
   § 8. Unfair labor practices
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7;

   .    .    .    .    .

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
   .    .    .    .
   (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under [this Act]
   .    .    . .
   (Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations  .    .    . and to engage in other concerted activities for  .    .    . other mutual aid or protection  .    .    .")

who participated with a number of rank-and-file union members in an illegal work stoppage where the steward failed to discharge his contractual obligation as a union officer to take steps to terminate that work stoppage. The Board held that it was. We disagree and, for the reasons set forth below, grant the petition for review and deny enforcement of the Board's order.

The relevant facts found by the administrative law judge (ALJ), affirmed by the Board, and which appear to be supported by substantial evidence, may be summarized as follows. On October 13, 1976, a number of members of Local 12, United Automobile, Aero Space and Agricultural Implement Workers of America (Union) engaged in an illegal work stoppage at Gould's plant in Philadelphia, Pennsylvania. Among those participating in the strike was shop steward James P. Moran.[2] At the time of the work stoppage Gould and the Union were signatories to a collective bargaining agreement, Article XVI of which dealt with strikes and lockouts. Section 1 of that Article contained a no-strike clause, § 2 provided that violators of the no-strike clause were subject to disciplinary action including discharge, and § 3, required union officials to take positive steps to terminate illegal work stoppages.[3]

2. Gould disputes the Board's finding that Moran was a mere participant in the strike and argues that he not only participated but also instigated and led it. In our opinion, however, that distinction is immaterial.

3. The complete text of those sections follows:
   Section 1. For the duration of this Agreement, and except for the failure of the Company or the Union to comply with the arbitration provisions of the Agreement, the Union agrees that it shall not call, sanction, or engage in any strike, slowdown or stoppage of work; and the Company agrees that it shall not cause or engage in any lockout.
   Section 2. Any employee or employees, either individually or collectively, who shall cause or take part in any illegal, unauthorized or uncondoned strike, work stoppage, interruption or impeding of work during the life of this Agreement may be disciplined or discharged by the Company. It is recognized that any such action by the Company shall be subject to the Grievance Procedure.
   Section 3. In the event of an illegal, unauthorized or uncondoned strike, work stoppage, interruption or impeding of work, the Local and International Union and its officers

Following an investigation into the strike, Gould singled out Moran for discharge from among the group of approximately fifty illegal strikers, and the Union responded by filing a grievance. At a fourth step grievance meeting the company stated that it had singled out Moran for discipline because he failed to carry out his Article XVI § 3 duty as steward to attempt to restore order and terminate the work stoppage and also because he had participated in a similar strike some three years earlier. To substantiate the latter claim, Gould cited excerpts from a February, 1976, letter which it had sent to the Union's president complaining, inter alia, of Moran's participation in a 1973 illegal strike. In that letter Gould had also complained of certain other activities of Moran; specifically, his filing of charges against Gould with the Equal Employment Opportunity Commission (EEOC), the Occupational Safety and Health Administration (OSHA), and the Board itself. With regard to these acts, however, the letter stated that while the company believed that Moran should have first used or exhausted the parties' agreed-upon procedures for resolving disputes, it nevertheless conceded that he had acted within his rights.

The grievance subsequently was withdrawn and unfair labor charges were filed against petitioner with the Board whose General Counsel then filed a complaint against Gould. The complaint charged that in addition to Gould's above-stated bases for selecting Moran for discharge, it was also motivated by his having filed the various charges with EEOC, OSHA, and the Board and was thus in violation of § 8(a)(4) of the Act, which prohibits retaliation against those who file charges alleging labor law violations. The complaint further alleged that one of the company's admitted grounds for discharging Moran—his failure to attempt to restore order and terminate the work stoppage—was in and of itself violative of the provisions of §§ 8(a)(1) and (3)

prohibiting, inter alia, interference with or discouragement of the exercise by employees of their right to organize or join unions.

As to the §§ 8(a)(1) and (3) charges the ALJ found that while as a steward Moran had a greater degree of responsibility than the other strikers under Article XVI § 3, discharging him because he ignored that responsibility was unlawfully discriminatory. In this ruling, the ALJ relied on the Board's decision in *Precision Castings Company*, 233 NLRB 183 (1977). In that case the Board held that selection for discipline of a steward from among a group of illegal strikers on the ground that he failed to restore order constituted "discrimination directed against an employee on the basis of his or her holding union office [and] is contrary to the plain meaning of Section 8(a)(3)." 233 NLRB 184.

The ALJ also concluded that the § 8(a)(4) charge had been substantiated, finding that Gould's decision to discharge Moran "was affected or motivated, in part, by the fact that Moran had filed charges with or complained to EEOC and OSHA, and also because he had filed a charge with the NLRB."

The Board affirmed the ALJ's findings and conclusions. As to the § 8(a)(4) violation for retaliatory conduct, the Board merely stated that it agreed with the conclusion that the evidence indicated Moran's filing of charges without prior resort to internal union procedures contributed to his discharge. In affirming the §§ 8(a)(1) and (3) violation, however, the Board set forth its reasoning in detail:

Arguing that an individual may be discharged for violating a contract provision while acting in his position as union steward begs the question. Here the steward acted in concert with approximately 50 other employees, but was singled out for discipline solely because he was the steward. He was discharged not because of his actions as an employee, but because of

shall immediately take positive and evident steps to have those involved cease such activity. These steps shall involve the following:
Within not more than twenty-four (24) hours after the occurrence of any such unauthorized action, the Union, its officers and representatives shall publicly disavow same by posting a notice on the bulletin boards throughout the plant. The Union, its officers

and representatives shall immediately order its members to return to work, notwithstanding the existence of any wild-cat picket line. The Union, its officers and representatives shall refuse to aid or assist in any way such unauthorized action.
The Union, its officers and representatives, will in good faith, use every reasonable effort to terminate such unauthorized action.

his lack of actions as a steward, a legally impermissible criterion for discipline under the Act, and one which is not validated by a contract clause that specifies the responsibilities of union officers while acting as union officers. The contract is binding between the employer and the union, but does not grant the employer the power to enforce it by discharging union officials. The employer's recourse is against the union entity rather than against the individuals who serve the unit by holding union office. Employer self-help against individual union officials for a union's breach of contract can only undermine the peaceful settling of disputes and clears a path for employer intervention in a union's internal affairs in a way that is specifically barred to unions in the corollary situation by Section 8(b)(1)(B), which prohibits restraint or coercion of an employer in the selection of his representatives for collective bargaining or adjusting grievances. 237 NLRB No. 124, 2–3.

We first consider the law applicable to the §§ 8(a)(1) and (3) violations and begin by noting our prior holding that "strikes carried out in violation of a no-strike provision in a collective bargaining agreement are not protected by the Act, and therefore the discharge of employees who engage in such strikes is not an unfair labor practice." *Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3rd Cir. 1974). Also relevant are Board rulings that an employer need not fire all illegal strikers, but may "pick and choose" which participants will be discharged as long as the basis for so doing is not union related. *Precision Castings, supra; Chrysler Corp.*, 232 NLRB 466, 474 (1977); *McLean Trucking Co.*, 175 NLRB 440, 450–51 (1969). See also *NLRB*

*v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939). And we note, finally, the holding of the Supreme Court in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), that if the discriminatory discipline complained of is so inherently destructive of employee rights there is no need to establish any specific anti-union motivation in order to sustain a § 8(a)(3) violation.

While there may be some question as to the Board's earlier position on the issue,[4] in *Precision Castings* the Board flatly held that the selective dismissal, in and of itself, of a shop steward who participated in and made no effort to terminate an illegal strike constituted discrimination based solely on the holding of union office and, thus, was violative of §§ 8(a)(1) and (3). However, when the Board followed *Precision Castings* with a similar ruling in *Ind. & Mich. Elec. Co.*, 237 NLRB No. 35 (1978), that ruling was reversed on appeal, *Ind. & Mich. Elec. Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979). The Board had ruled that the greater responsibility which accompanies the holding of union office was insufficient reason for imposing more severe discipline on officers than rank-and-file strikers. In reversing, the court reasoned:

> Employees have no right to participate in an illegal strike. Accordingly, if an employee right is threatened here, it must be one relating to union office. The Board has said and we recognize that union office 'embodies the essence of protected concerted activities.' See *General Motors Corp.*, 218 N.L.R.B. 472, 477 (1975), *enforced*, 535 F.2d 1246 (3rd Cir. 1976). Employer action that would impair some right or restrict some legitimate activity of union officials and there-

---

**4.** On several occasions prior to its decision in *Precision Castings*, the Board reviewed the discharge of union stewards following their participation in illegal strikes and found no unfair labor practice. See *Super Valu Xenia*, 228 NLRB 1254 (1977); *Chrysler Corp.*, supra; *J. P. Weaterhy Construction Co.*, 182 NLRB 690 (1970); *Russell Packing Co.*, 133 NLRB 194 (1961); *University Overland Express, Inc.*, 129 NLRB 82 (1960); and *Stockham Pipe Fittings Co.*, 84 NLRB 629 (1949). The General Counsel now seeks to distinguish those cases on the ground that they involved stewards who exercised a leadership role in the strike, whereas here Moran was a mere participant. From our review of the cases it does not appear that

*Precision Castings* is as consistent with prior Board rulings as the General Counsel would maintain. First, we note that certainly in *Super Valu Xenia* and arguably in *Russell*, the steward did not exercise a leadership role. Second, even where leadership apparently existed, the Board gave little, if any, indication that this was a controlling factor; i. e. that in its absence a § 8(a)(3) violation would not have been found. In fact, in *Stockham* and *Overland Express* the Board acknowledged that union officials have a greater responsibility to abide by a no-strike clause than do the rank-and-file, thus suggesting at least that mere participation in an illegal strike by a union officer might be a sufficient basis for his selective discipline.

by discourage members from holding office would no doubt have an inherently adverse affect on employee rights. The same is not true, however, of employer action that at most deters union officials from deliberately engaging in clearly unlawful conduct that is both a violation of their duties as employees and union members and a repudiation of their responsibilities as union officials.

In arguing that status as a union official may not be the sole criterion for differentiating among employees in meting out discipline, the Board somewhat misstates the issue. The more severe punishment was not based merely on the officials' status but upon their breach of the higher responsibility that accompanies that status, a breach that makes their misconduct more serious than that of the rank-and-file. 599 F.2d 230

. . . .

Differentiating between union officers and rank-and-file in meting out discipline for participating in a clearly illegal strike (footnote omitted) did not penalize or deter the exercise of any protected employee right. We believe the employer was entitled to take into account the union officials' greater responsibility and hence greater fault, and that the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights. 599 F.2d 232

We concur in that reasoning and believe that it applies as well to the instant case and supports our conclusion that the Board's finding of a § 8(a)(1) and (3) violation must be vacated. More specifically, we cannot agree with the Board's deduction that since Moran was a steward and was discharged it follows logically that he "was singled out for discipline *solely because* he was the steward." On the contrary, it is clear that he was disciplined because he participated in an illegal strike and failed to perform his contractual obligation to take positive steps to halt that work stoppage. True, this duty devolved upon him because he fell within the *class* of persons upon whom the collective bargaining agreement imposed that duty, to wit, officers of the union, but the agreement could just as well have imposed this duty on individuals by name regardless of their office, and the

result would be the same. In other words, it was a breach of a duty *imposed* by his office and not his office *as such* which formed the basis for his discharge. Viewed in this light, Moran's discharge was permissible and did not constitute an unfair labor practice. Indeed, if we were to hold otherwise, the union officer who participated in an illegal work stoppage would be placed in a more advantageous position than the rank-and-file member, and this would be neither fair, logical nor just.

The General Counsel's argument that since the company lacked the right under the contract to discharge Moran for violating Article XVI § 3 his discharge was unlawful is unpersuasive. It is true that § 3 contains no provision for the discipline of those who violate it, however, § 2 does give the company the right to discharge those who participate in illegal work stoppages. Section 3 of Article XVI was relied upon merely as a basis for singling out Moran from among the strikers subject to discharge. This was lawful.

■ Having concluded that Moran had a contractual duty to take positive steps to terminate the illegal work stoppage and that his breach of that duty served as a basis for invoking a right of discharge otherwise existing, we inquire whether such action was inherently prejudicial of important employee rights. Here, too, we concur with the court's reasoning in *Ind. & Mich. Elec. Co.* that logically no prejudice to employee rights can result where the employee is merely deterred from engaging in illegal activity and from breaching a contractual obligation, neither of which he has a *right* to do. As for the contention that as a result of this ruling prospective stewards will be dissuaded from seeking union office, the obvious and short answer is that they should be deterred from seeking office if they intend thereafter to participate in illegal work stoppages or to repudiate contractual obligations which were freely negotiated and voluntarily assumed. The company's action and our ruling deters no other kind of "union" activity. *Cf. American Ship Building Company v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

■ Finally, we cannot accept the Board's holding that the employer's proper remedy in a case such as this is a suit

against the union for money damages. *Assuming* that such a claim could be maintained against the union, we see no reason why the employer should be remitted to such a course of action where the collective bargaining contract plainly gives the employer recourse directly against an offending officer, the assertion of which the employer in its judgment may very well conclude would have a more immediate and prophylactic effect. For it is undoubtedly true in many illegal strike situations that the employer would prefer to obtain a prompt resumption of production than a money judgment after a prolonged strike and expensive and protracted litigation. And it is certainly fair to assume that usually it is the steward or some other union official close to the scene who has the power, authority and influence most effectively to quash an illegal strike during its infancy or to prolong it indefinitely. The threat of his disciplinary discharge, therefore, is a valuable option which the employer should not be prohibited from exercising where it has been contractually acquired.

■■■ We now consider the § 8(a)(4) violation. As earlier noted, § 8(a)(4) of the Act makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges. . . ." The Board affirmed the ALJ's ruling that Moran's discharge was "affected or motivated in part" because he had filed charges with EEOC, OSHA and the Board. However, this falls short of holding that Moran was discharged "because of" these protected activities. This court previously held that where an employee's discharge is prompted by concurrent reasons, some permissible and some not, in order to support a ruling of an unfair labor practice the Board must find that the permissible reason proffered by the employer is merely a pretext and that in fact the employee was disciplined because of anti-union sentiment. *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363 (3rd Cir. 1978). To put it another way, if it is found that the employee would have been disciplined for proper cause notwithstanding the employer's attitude toward the union, the discipline must be held to be nondiscriminatory, because in that case the causal relationship between the anti-union bias and the discipline would be insufficient to support a conclusion that the discipline

was administered "because of" the protected activity and that the proffered proper reason was a pretext, it being elementary logic that the discipline could not be "because of" anti-union bias if the discipline would have resulted notwithstanding the absence of such bias. We reaffirm this court's previous statement of the proper precept to be applied where there is a mixed motivation attending employer's action: "Although there might exist a justifiable cause for discharge of an employee, there is a violation of the Act if the real motive for the discharge is found to be the employer's dislike of union activity or affiliation. . . . Such real motive will be found where union activity by the employee is recognized as a substantial or motivating cause of his discharge." *N.L.R.B. v. Gentithes*, 463 F.2d 557, 560 (3d Cir. 1972) (per Chief Judge Seitz). It is also controlling case law of this court that where there is substantial evidence that the employee's discharge was motivated by the employee's protected activity, there is a violation of the Act notwithstanding the concurrent existence of an otherwise valid reason. *N.L.R.B. v. Princeton Inn Co.*, 424 F.2d 264, 265 (3d Cir. 1970). From our review of the entire record we conclude that there is no substantial evidence to support a finding that Moran's discharge was because he had filed charges with the EEOC, OSHA, and the Board. Accordingly the Board's holding of a § 8(a)(4) violation must be vacated.

The petition for review will be granted and the application for enforcement will be denied.