**METROPOLITAN EDISON COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Local Union 563, International Brotherhood of Electrical Workers, Intervenor.**

No. 80–2588.

United States Court of Appeals, Third Circuit.

Argued July 14, 1981.

Decided Nov. 13, 1981.

Rehearing and Rehearing In Banc Denied Jan. 5, 1982.

Anthony A. DeSabato (argued), George A. Burnstein, Kleinbard, Bell & Brecker, Philadelphia, Pa., for petitioner.

Robert G. Sewell, Michael R. White (argued), Attys., N.L.R.B., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Paul Alan Levy (argued), Alan B. Morrison, Public Citizens Litigation Group, Washington, D. C., for intervenor.

Before SEITZ, Chief Judge, and VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Metropolitan Edison Company (the Company) petitions for review of an order of the National Labor Relations Board (the Board) finding that the Company violated section 8(a)(1) and (3) of the National Labor Relations Act (the Act) by disciplining two officers of intervenor Local Union 563 (the Local) more severely than rank-and-file members for participating in an illegal work stoppage. The Board cross-petitions for enforcement of its order. This court has jurisdiction under section 10(e) and (f) of the Act, as amended. 29 U.S.C. § 160(e) & (f) (1976).

### I.

The Company, a public utility that provides electrical power to customers in Southeastern Pennsylvania, started construction of a two-unit nuclear generating station at Three Mile Island (TMI) in 1968. The construction was still underway in 1977. At that time, over half of the Company's employees were represented by five local unions of the International Brotherhood of Electrical Workers (the Union) under a collective bargaining agreement that took effect on May 1, 1976. Article XI of the agreement provided:

The Brotherhood and its members agree that ... there shall be no strikes or walk-outs by the Brotherhood or its members, and the Company agrees that there shall be no lockouts of the Brotherhood or its members, it being the desire of both parties to provide uninterrupted and continuous service to the public.

Under prior collective bargaining agreements containing the same provision, members of the Union had violated the no-strike provision four times. On each occasion the Company disciplined the Union officers more severely than its members. The Company justified the disparity in discipline on the ground that union officers, unlike the members, have an affirmative duty to try to end an illegal strike. Twice the Union grieved to arbitration the issue of whether the Company could impose the extra discipline, and twice the Union lost.

The events that gave rise to this dispute occurred on August 30, 1977. Members of the Operating Engineers' Union picketed the north entrance to TMI. Members of the Local, including its president Lang and vice-president Light, refused to cross that picket line. The administrative law judge succinctly described the events on that morning:

Both [Lang and Light] spent the morning of August 30, 1977, seeking to secure removal of the picket line so that their members, who had earlier indicated an unwillingness to cross any picket line, would go to work. Thus, Lang had come to [TMI] early on the morning of August 30, pursuant to a phone call from [the Company's personnel administrator], in which [he] advised [Lang] that there was a picket line which the [Local's] members were refusing to cross and requested him to see what could be done. In the course of their conversations that morning, [the administrator] reiterated to Lang a position taken by the Company a number of times previously that the union officers had a particular obligation to cross the picket line so that other employees would follow. When Lang arrived at the gate he spoke to the Operating Engineers'

picket captain, learned the reason for the picket line, and was told that the line would not be removed unless removal was ordered by his business agent. Lang called the business agent. Subsequently, Lang went to the union hall, ... and directed Gene Light to go the Operating Engineers to see whether he could negotiate with them to get them off the bridge. When he returned to the picket line, Lang was again told [by two Company officers] that he had a particular obligation as a union official to cross the picket line. Lang told [one of them] that it was the consensus of the members that they were not going to cross until the picket line came down and he told [the other] that he felt it was better if he stayed out because then he could at least negotiate with the pickets. Gene Light had substantially similar conversations with both [officers].

In the course of discussing what it would take to have the picket line removed, the Operating Engineers' steward told Lang that they would remove the picket line if the contractors ceased using the north bridge.

After Lang related this conversation to the Company's coordinator of services, the Company set up a reserved gate for the contractors' employees at the south bridge, the picket line came down, and the Local's members went to work.

Of the 135 rank-and-file members who refused to cross the picket line, 121 received five-day suspensions, and fourteen who had participated in previous illegal stoppages received ten-day suspensions. Lang and Light each received a twenty-five-day suspension. The Company stated in the written records of its disciplinary action that the harsher discipline for each was justified because in addition to violating the no-strike clause, each had

[failed] as an elected official of [the Local] to demonstrate to the Company, in an objective manner, [his] affirmative duty as an elected officer to:

(a) Make every effort to uphold the sanctity of the Agreement and its established grievance procedures.

(b) Make every bona fide effort to prevent the unlawful work stoppage.

(c) Make every effort, including returning to work [himself], to end the unlawful work stoppage.

The Local filed an unfair labor practice charge, and the General Counsel issued a complaint against the Company. The administrative law judge found that the Company's actions violated section 8(a)(1) and (3) of the Act, and the Board adopted his rulings, findings, and conclusions, although modifying the terms of his cease and desist order. *Metropolitan Edison Co.*, 252 N.L.R.B. 1030 (1980).

## II.

■ An employer may impose greater discipline on union officials if the collective bargaining agreement enumerates specific affirmative steps a union official is to take in the event of an illegal work stoppage and the official has failed to perform those actions. In *Gould Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied sub nom. Moran v. Gould Corp.*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), this court held that an employer did not commit an unfair labor practice when it singled out from among fifty participants in an illegal work stoppage a union steward for discharge. The collective bargaining agreement contained a no-strike clause, and also required union officials to take affirmative steps to end illegal work stoppages:

In the event of an illegal [work stoppage], the Local and International Union and its officers shall immediately take positive and evident steps to have those involved cease such activity. These steps shall involve the following: Within not more than twenty-four (24) hours after the occurrence of any such unauthorized action, the Union, its officers and representatives shall publicly disavow same by posting a notice on the bulletin boards throughout the plant. The Union, its officers and representatives shall immediately order its members to return to work, notwithstanding the existence of any wildcat picket line. The Union, its

officers and representatives shall refuse to aid or assist in any way such unauthorized action. The Union, its officers and representatives, will in good faith, use every reasonable effort to terminate such unauthorized action.

612 F.2d at 730 n.3. The court held that the employer's discharge of the steward did not discriminate against the exercise of protected section 7 concerted activities because the company disciplined the steward not because of his status as a union officer but because of his failure to fulfill the responsibilities imposed on him by the collective bargaining agreement. The court further held that the discharge of the steward for violation of that contractual duty was not inherently destructive of employee rights and thus an unfair labor practice under the doctrine of *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967), because (1) there is no right to strike illegally or to violate contractually imposed duties, and (2) anyone dissuaded from seeking union office by such a rule should be dissuaded if he or she intended to engage in illegal strikes or to violate contractual obligations. *Id.* at 730–33.

■ If the collective bargaining agreement requires in general terms that union officials take affirmative steps to end an illegal work stoppage, a union official does not breach that duty simply because he does not take the exact affirmative steps the employer ordered him to take. Only if his actions in complying with that duty are not in good faith does he become subject to greater discipline. In *C. H. Heist Corp. v. NLRB*, 657 F.2d 178 (7th Cir. 1981), an employer discharged only one out of twenty-five employees who participated in an illegal work stoppage—the shop steward. There was a no-strike provision in the collective bargaining agreement. The court held that the only basis for finding a greater obligation on the steward than on the other employees was a provision that, "The steward's duties shall consist of seeing that all terms and conditions of the Agreement are being complied with . . . ." *Id.* at 181. The steward, both before and during the

work stoppage, attempted to dissuade the employees from striking, but would not cross the picket line as the employer wanted him to do. The court held that the employer had committed an unfair labor practice in more harshly disciplining the steward, because "[i]n the absence of a clear contractual provision requiring [the steward] to cross the picket line, his efforts were sufficient, if not the most effective possible, to satisfy his obligation to see that the no strike clause was complied with." *Id.* at 183.

■ If the collective bargaining agreement does not specify that union officials have some responsibility to try to end an illegal work stoppage, then the company may not impose any greater discipline on union officials than on other participants in the strike. In *Hammermill Paper Co. v. NLRB*, 658 F.2d 155 (3d Cir. 1981), an employer had punished a union steward who took part in an illegal work stoppage more severely than other participants. The collective bargaining agreement contained a general no-strike clause. However, the *Hammermill* agreement contained no provision that placed any greater responsibilities on union officials than on the rank-and-file members, and the arbitrator in a grievance proceeding on the same matter had held that the contract placed no increased responsibilities on union officials. In those circumstances, the two members of the panel who reached the issue held that the company had committed an unfair labor practice in singling out the steward for harsher punishment. *Id.* at 163 (opinion of Rosenn, J.); *id.* at 166–67 (opinion of Higginbotham, J.).[1]

■ The rules developed from the *Gould, Heist,* and *Hammermill* cases are consonant with sound labor policy. The rules recognize the principle that although statutory rights may be waived, courts will generally not find a waiver unless it is clear and unmistakable. *See Texaco, Inc. v. NLRB,* 462 F.2d 812, 815 (3d Cir.), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 302 (1972). The rules recognize that, since the holding of union office is the essence of protected union activities, *see General Motors Corp.,* 218 N.L.R.B. 472, 477 (1975), *enforced mem.,* 535 F.2d 1246 (3d Cir. 1976), discriminatory punishment solely on the basis of holding union office is a section 8(a)(3) unfair labor practice.[2] *Hammermill,* 658 F.2d at 163; *id.* at 166–67. Although it is true that we need not hesitate to adopt a rule that allows union officials to be punished discriminatorily if such a ruling would deter prospective union officials from seeking union office because they intend after assuming office to participate in illegal work stoppages and to repudiate voluntarily assumed contractual obligations, *see Gould,* 612 F.2d at 733, this case illustrates the limits of that rationale. Allowing the discriminatory punishment that the Company imposed on Lang and Light might deter others from seeking union office because of the fear that, if an illegal strike were to occur, they would be put into an untenable position: either obey the company and lose their authority,[3] or follow their own judgment and risk harsher punishment. It is because of this dilemma that we will not interpret a collective bargaining

1. To the extent that *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979), is inconsistent with *Gould, Heist,* and *Hammermill*, we decline to follow it. *See Hammermill*, 658 F.2d at 163–65 (opinion of Rosenn, J.) (distinguishing *Indiana*); *id.* at 167 (opinion of Higginbotham, J.) (rejecting *Indiana*). We also note that the Court of Appeals for the Seventh Circuit appears to have limited the scope of the *Indiana & Michigan* decision. *See Heist*, 657 F.2d at 182–83.

2. If union officials take a leadership role in support of an illegal work stoppage, then they may be more severely disciplined for that rea-

son. *See J. P. Wetherby Construction Co.*, 182 N.L.R.B. 690 (1970).

3. This possibility was demonstrated on August 4, 1977. That morning, members of the Local had refused to cross the picket line established by the Pipefitters' Union at the north entrance to TMI. After this incident the Company advised Lang and Light that they had a legal obligation to cross the picket line and to urge their membership to do the same. At a meeting after work on August 4, Lang told the members of their obligations, but the membership shouted down his urgings that they cross picket lines.

agreement to impose additional responsibilities on union officials absent clear language showing that the union agreed to it. *Compare Heist*, 657 F.2d at 182–83 (similar analysis where agreement did not specify the responsibilities it imposed on union official).

■ Because the agreement here, like that in *Hammermill*, did not expressly impose a duty on the Union officials to attempt to halt an illegal work stoppage, the Company committed an unfair labor practice when it disciplined Lang and Light more harshly than the other participants in work stoppage of August 30.

### III.

The Company argues that, notwithstanding the absence of any explicit contractual language placing greater responsibilities on the Union officials, two earlier arbitrations had interpreted identical language in previous collective bargaining agreements between the Company and the Union to require Union officials to take affirmative steps to end an illegal work stoppage. Because the relevant language was not changed in any of the renewals since the time of those decisions, the Company argues that we are bound by the arbitral awards construing the collective bargaining agreement to place greater responsibilities on union officials.

■ There are two arbitration awards on which the Company relies: the Howard arbitration in 1973 and the Seidenberg arbitration in 1975. Both arbitrations arose out of illegal work stoppages in which the Company had disciplined union officials more severely than rank-and-file members. Both times the issue before the arbitrator was whether the company had had just cause for the discipline. In neither hearing did the Union raise the issue whether the collective bargaining agreement placed great-er responsibilities on the Union officials. The only discussion of the origin of the greater responsibilities occurred in the Howard arbitration. The arbitrator stated:

> It is well-established that Union officials have an *affirmative duty* to protect the authority of the Union leadership from illegitimate action on the part of employees, and to uphold the sanctity of the Agreement and its established grievance procedures. Failure to exercise this responsibility subjects them to more serious penalties.... Indeed, the mere *participation* by Union leaders in an illegal work stoppage is sufficient to justify a differential penalty ....

(emphasis in the original).

The narrow issue before us is whether we are bound by the previous arbitral interpretations. We hold that we are not.[4]

■ Normally an arbitrator need not follow previous arbitrations construing the same agreement. *See New Orleans Steamship Association v. General Longshore Workers*, 626 F.2d 455, 468 (5th Cir. 1980), *cert. granted sub nom. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Riverboat Casino, Inc. v. Local Joint Executive Board*, 578 F.2d 250, 251 (9th Cir. 1978) (to require adherence to previous arbitration would reduce flexibility of the arbitral process). It follows that when this court is called upon to construe a collective bargaining agreement, it need not follow a previous arbitral interpretation. To bind this court to a contractual interpretation made in a previous arbitral award would not be consistent with what the parties bargained for: arbitration as a dispute resolution process for specific grievances. *See NLRB v. Pincus Brothers, Inc.-Maxwell*, 620 F.2d 367, 374 (3d Cir. 1980).

---

4. The administrative law judge held that he was not bound to the previous interpretations because, if they had been made today, the Board "would *likely* find those awards repugnant to the purposes and policies of the Act," 252 N.L.R.B. at 1035 (emphasis added), under the analysis of *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955). Because we reach the same result on other grounds, we do not decide whether the conclusory *Spielberg* analysis was correct.

An exception to the general rule may be found if the collective bargaining agreement so provides. *Riverboat Casino,* 578 F.2d at 251. However, that exception is not applicable here, because the agreement between the Company and the Union does not provide that one arbitration is to be bound by an earlier decision, unless the earlier decision was made under the same collective bargaining agreement. Article IX, § 9.2, 4th ("A decision [by an arbitrator] shall be binding . . . for the term of this Agreement."). The two arbitrations upon which the Company relies were made under previous agreements. Additionally, the agreement provides that "all Customs and Practices" between the Company and the Union are to be listed in the agreement. The agreement lists no practice of being bound to arbitrations under previous agreements.

## IV.

█ The Company further argues that its harsher discipline of Lang and Light was justified because Lang and Light were leaders of the strike. *See J. P. Wetherby Construction Co.,* 182 N.L.R.B. 690 (1970). The

Board rejected this argument, finding that Lang and Light were not active leaders of the strike. Our review persuades us that the Board's finding is supported by substantial evidence on the record considered as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

## V.

The Company's petition for review will be denied, and the Board's order will be enforced.

VAN DUSEN, Senior Circuit Judge, dissenting:

I respectfully dissent from the majority opinion because my analysis indicates that it is contrary to *Gould, Inc. v. N.L.R.B.,* 612 F.2d 728 (3d Cir.), *cert. denied sub nom. Moran v. Gould Corp.,* 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980),[1] which is this court's most pertinent decision on the facts presented by this record, and hence in violation of Chapter VIII, paragraph C (p. 25), of the Internal Operating Procedures

---

1. Note 3 of the dissenting opinion of Member Penello makes clear that the Board, in promulgating its September 1980 decision, see *Metropolitan Edison Company, et al.,* 252 N.L.R.B. 1030, 1031 (1980), was referring to the December 1979 opinion of this court in *Gould,* as opposed to the opinion in that case as it was amended in March 1980, since *Gould, supra,* was cited at 252 N.L.R.B. 1031 *and* 103 LRRM 2207 as 612 F.2d 728 (3d Cir. 1979), rather than as a 1980 decision. On March 13, 1980, the court added this wording to the *Gould* opinion in place of the last two sentences on page 12 of the 1979 slip opinion:

   "We reaffirm this court's previous statement of the proper precept to be applied where there is a mixed motivation attending employer's action: 'Although there might exist a justifiable cause for discharge of an employee, there is a violation of the Act if the real motive for the discharge is found to be the employer's dislike of union activity or affiliation. . . . Such real motive will be found where union activity by the employee is recognized as a substantial or motivating cause of his discharge.' *N.L.R.B. v. Gentithes,* 463 F.2d 557, 560 (3d Cir. 1972) (per Chief Judge Seitz). It is also controlling case law of this court that where there is substantial evidence

   that the employee's discharge was motivated by the employee's protected activity, there is a violation of the Act notwithstanding the concurrent existence of an otherwise valid reason. *N.L.R.B. v. Princeton Inn Co.,* 424 F.2d 264, 265 (3d Cir. 1970). From our review of the entire record we conclude that there is no substantial evidence to support a finding that Moran's discharge was because he had filed charges with the EEOC, OSHA, and the Board. Accordingly the Board's holding of a § 8(a)(4) violation must be vacated."

   612 F.2d at 734. The report in 103 LRRM 2207 does not contain this new language, but it contains the previous language from the 1979 slip opinion. See 103 LRRM at 2211 (last two sentences).

   More importantly, the majority of the Board cited and relied on *Precision Castings Company,* 233 N.L.R.B. 35 (1977), a decision which this court implicitly rejected in *Gould* when it adopted the reasoning of *Ind. & Mich. Elec. Co. v. N.L.R.B.,* 599 F.2d 227 (7th Cir. 1979), in the passage quoted on pp. 486 & 487 of this dissent. 612 F.2d at 732–33. The Board's brief in this appeal admits that it refused to follow our decision in *Gould* and instead applied its own case law. Respondent's brief at pp. 32–35.

(IOP) of this court.[2] I would vacate the Board's order and remand the case to the Board for reconsideration and application of the principles of *Gould, supra,* to the factual situation presented by this record.

In addition to the language quoted from the decision of the ALJ on page 480 of the majority opinion, that decision contains this wording at p. 1034 of 252 N.L.R.B.:

> "Respondent contends that Lang and Light were given the greater discipline not because they held union office but rather:
>
> > ... it was awarded because of things they did or did not do; statements they made or did not make; and, the misuse of the union office they held.
>
> "Respondent points out that, while violations of the no-strike agreement were not frequent at its plants, the August 30 incident was not the first. On prior occasions in 1970, 1972, 1973, and 1974, members of various IBEW locals engaged in work stoppages in violation of the contract. In each of those incidents the participating employees were disciplined and the union officers or stewards involved were given greater discipline for failure to make bona fide efforts to get the employees back to work. Indeed, in the 1973 work stoppage, which occurred at T.M.I., Lang and Light, as union officers, received the greater discipline. In 1972 and 1974, when the Union took to arbitration the question of the greater discipline assigned to the union officers, the Company's discipline was upheld. In both arbitration decisions, the arbitrators held that union officials had an affirmative duty, by virtue of their office, to honor and protect the collective-bargaining agreement, and that failure to exercise that responsibility subjected them to more severe penalties. Respondent also pointed out that both Lang and Light had been told repeatedly, both prior to the August 30 incident and while it was oc-

curring that Respondent expected them to set an example for the other employees by crossing the picket line and that it would discipline them if they failed to do so. Further, Respondent argued, by attempting to secure the removal of the picket line as a means of getting the employees back to work, rather than leading the employees across the picket line or ordering those employees to cross, Lang and Light 'became the active leaders of the strike.' This, Respondent stated, was a factor considered significant in determining the degree of their discipline.

> "Respondent also adduced evidence that a work stoppage similar to that of August 30 had taken place on August 4. At that time, various participating employees, not including Lang and Light, were disciplined. Lang and Light were both told, quite emphatically, that the Employer considered it their obligation to cross a picket line and set a proper example for their members. At a union meeting following this work stoppage, Lang told his membership of their legal obligations. The membership vociferously rejected his urgings that they cross such picket lines.

> "Finally, Respondent points to an incident involving David Lang which it contends provides separate justification for the greater discipline accorded him. Early on the morning of August 30, after Lang had been summoned to the line by Hahn, an employee drove up, observed the pickets, and asked what he should do. According to Hahn, Hahn said 'come to work,' but *Lang told the employee, 'go to the union hall.'* According to Lang, when the employee (identified by Lang as Tom Lynch) asked what he should do, *Lang told him 'you know what you are supposed to do.' The employee never left his vehicle but drove off in the direction of*

**2.** Paragraph C of Chapter VIII of the IOP reads as follows:

> "It is the tradition of this court that reported panel opinions are binding on subsequent

panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court in banc consideration is required to overrule a published opinion of this court."

*the union hall. Lang saw Lynch later at the union hall."*

(Emphasis supplied; footnotes omitted.)

The majority has chosen to follow language in two separate opinions of two individual judges on the panel in *Hammermill Paper Co. v. N.L.R.B.*, 658 F.2d 155 (3d Cir. 1981), a case where each of the two members of the panel concurring in the judgment of the court stated his own views separately, rather than the very clear and strong language used by a unanimous panel of this court in *Gould, supra*, the facts of which are closer to those in this case than are the facts of *Hammermill*. In *Gould*, this court used the following language at pp. 732–33:

"We first consider the law applicable to the § 8(a)(1) and (3) violations and begin by noting our prior holding that 'strikes carried out in violation of a no-strike provision in a collective bargaining agreement are not protected by the Act, and therefore the discharge of employees who engage in such strikes is not an unfair labor practice.' *Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3d Cir. 1974). Also relevant are Board rulings that an employer need not fire all illegal strikers, but may 'pick and choose' which participants will be discharged as long as the basis for so doing is not union related. *Precision Castings, supra; Chrysler Corp.*, 232 NLRB 466, 474 (1977); *McLean Trucking Co.*, 175 NLRB 440, 450–51 (1969). See also *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939). And we note, finally, the holding of the Supreme Court in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), that if the discriminatory discipline complained of is so inherently destructive of employee rights there is no need to establish any specific anti-union motivation in order to sustain a § 8(a)(3) violation.

". . . when the Board followed *Precision Castings* with a similar ruling in *Ind. & Mich. Elec. Co.*, 237 NLRB No. 35 (1978), that ruling was reversed on appeal, *Ind. & Mich. Elec. Co. v. N.L.R.B.*, 599 F.2d 227 (7th Cir. 1979). The Board had ruled that the greater responsibility which accompanies the holding of union office was insufficient reason for imposing more severe discipline on officers than rank-and-file strikers. In reversing, the court reasoned:

Employees have no right to participate in an illegal strike. Accordingly, if an employee right is threatened here, it must be one relating to union office. The Board has said and we recognize that union office 'embodies the essence of protected concerted activities.' See *General Motors Corp.*, 218 N.L.R.B. 472, 477 (1975), *enforced*, 535 F.2d 1246 (3d Cir. 1976). Employer action that would impair some right or restrict some legitimate activity of union officials and thereby discourage members from holding office would no doubt have an inherently adverse effect on employee rights. The same is not true, however, of employer action that at most deters union officials from deliberately engaging in clearly unlawful conduct that is both a violation of their duties as employees and union members and a repudiation of their responsibilities as union officials.

In arguing that status as a union official may not be the sole criterion for differentiating among employees in meting out discipline, the Board somewhat misstates the issue. The more severe punishment was not based merely on the officials' status but upon their breach of the higher responsibility that accompanies that status, a breach that makes their misconduct more serious than that of the rank-and-file. 599 F.2d 230.

\*   \*   \*   \*   \*   \*

Differentiating between union officers and rank-and-file in meting out discipline for participating in a clearly illegal strike (footnote omitted) did not penalize or deter the exercise of any protected employee right. We believe the employer was entitled to take into

account the union officials' greater responsibility and hence greater fault, and that the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights. 599 F.2d 232.

"We concur in that reasoning and believe that it applies as well to the instant case and supports our conclusion that the Board's finding of a § 8(a)(1) and (3) violation must be vacated. More specifically, we cannot agree with the Board's deduction that since Moran was a steward and was discharged it follows logically that he 'was singled out for discipline *solely because* he was the steward.' On the contrary, it is clear that he was disciplined because he participated in an illegal strike and failed to perform his contractual obligation to take positive steps to halt that work stoppage. True, this duty devolved upon him because he fell within the *class* of persons upon whom the collective bargaining agreement imposed that duty, to wit, officers of the union, but the agreement could just as well have imposed this duty on individuals by name regardless of their office, and the result would be the same. In other words, it was a breach of a duty *imposed* by his office and not his office *as such* which formed the basis for his discharge. Viewed in this light, Moran's discharge was permissible and did not constitute an unfair labor practice. Indeed, if we were to hold otherwise, the union officer who participated in an illegal work stoppage would be placed in a more advantageous position than the rank-and-file members, and this would be neither fair, logical nor just.

"The General Counsel's argument that since the company lacked the right under the contract to discharge Moran for violating Article XVI § 3 his discharge was unlawful is unpersuasive. It is true that

§ 3 contains no provision for the discipline of those who violate it, however, § 2 does give the company the right to discharge those who participate in illegal work stoppages. Section 3 of Article XVI was relied upon merely as a basis for singling out Moran from among the strikers subject to discharge. This was lawful.

". . . As for the contention that as a result of this ruling prospective stewards will be dissuaded from seeking union office, an obvious and short answer is that they should be deterred from seeking office if they intend thereafter to participate in illegal work stoppages or to repudiate contractual obligations which were freely negotiated and voluntarily assumed. The company's action and our ruling deters no other kind of 'union' activity."

(Emphasis in original.)

Also, in *Hammermill, supra,* Judge Rosenn, writing the OPINION OF THE COURT, pointed out that

". . . the result we reach is not at all inconsistent with *Gould* and *Indiana.* Nor do we see any need to reconsider our decision in *Gould. . . .* [W]e caution the Board that insofar as *Gould* holds that an employer may use discipline as a means of enforcing the individual duties of union officials, we continued to adhere to that precedent."

It is noted that *Indiana,* cited above, is referred to in that portion of the *Gould* opinion quoted above.

There is no showing that the company ever approved, condoned, or ratified the personal decision of the two union officials to negotiate with the pickets, thereby prolonging the work stoppage, instead of leading their fellow union members across the picket line to work for this electric utility supplying power to the Harrisburg area of southeastern Pennsylvania.[3]

---

3. I note that this court had pointed out in *Eazor Exp., Inc. v. International Bro. of Team., Etc.,* 520 F.2d 951, 964 n.6 (3d Cir. 1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), *overruled on other grounds sub*

nom. *Carbon Fuel Co. v. Mine Workers,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979):
   "That . . . discipline has been successfully used by a Teamsters local and that its use might well have been successful here is indi-

I believe the terms of VIII–C quoted above in note 2 require that this case, at the least, be remanded to the Board, which may decide to have it reconsidered by the ALJ, who heard the witnesses, in light of *Gould*, as amended, and *Hammermill*, neither of which decision in its final form was considered by the ALJ (see note 1 above).

cated by the case of an unauthorized strike by members of Local 241 of the Teamsters International Union against Eazor at Sharon, Pennsylvania in April 1968 where the strike was ended when a steward who refused to cross the illegal picket line was removed by the officers of the local union and another put in his place who led most of the strikers back to work across the picket line."