Ervin **SZEWCZUGA** and Gerald Treichel, Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**MILLER BREWING COMPANY,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 81–1054, 81–1413.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1982.

Decided Aug. 17, 1982.

Erle Phillips, Atlanta, Ga., with whom Mark E. Edwards, Atlanta, Ga., and Daniel P. Dockery, were on brief, for petitioner in No. 81–1413.

Gerry M. Miller, Milwaukee, Wis., with whom Scott D. Soldon, Milwaukee, Wis., was on brief, for petitioners in No. 81–1054.

Elliott Moore, Deputy Ass'n Gen. Counsel, N. L. R. B., Washington, D.C., with whom John G. Elligers, Atty., N. L. R. B., Washington, D. C., was on brief, for respondent.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and NORTHROP *, United States Senior District Judge for the District of Maryland.

Opinion for the Court filed by Senior Circuit Judge. McGOWAN.

McGOWAN, Senior Circuit Judge:

Following a contractually forbidden strike by some of the electricians at its Milwaukee brewery, Miller Brewing Company suspended the rank-and-file participants for three days, but discharged two union stewards who joined the walkout. The National Labor Relations Board ("NLRB" or "Board") decided that Miller had violated sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA" or

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

"Act")[1] by discharging the two stewards, and ordered Miller to reinstate them, with back pay for the period by which their discipline exceeded that given to the rank and file. Miller has petitioned for review of the Board's order, as have the two stewards, Ervin Szewczuga and Gerald Treichel. The Board has cross-petitioned for enforcement of its order.[2]

We enforce the Board's order in all respects. We conclude that substantial evidence supports the Board's determination that Szewczuga and Treichel were not strike leaders, and that Miller officials had no basis for believing that they were. We also answer a question left open in our recent decision in *Fournelle v. NLRB*, 670 F.2d 331, 338 (D.C.Cir.1982): we hold that an employer may not impose disparate discipline on a union official who engages in an unprotected strike, if the official was not a leader of the strike and if the collective bargaining process has not explicitly created higher duties for union officials during such strikes. As to the stewards' challenge, we find the Board's remedy an appropriate one for the violation found.

## I. BACKGROUND

Petitioners Szewczuga and Treichel filed an unfair labor practice charge against petitioner Miller on December 13, 1977;[3] the Board's General Counsel issued a complaint based upon the charge on August 11, 1978.[4]

Following a trial in January of 1979, Administrative Law Judge Herzel H.E. Plaine (the "ALJ") issued his decision on April 2, 1980.[5] The Board affirmed the findings of the ALJ and adopted his order with modifications on January 14, 1981.[6] A summary of the ALJ's findings follows.[7]

On the morning of November 1, 1977, Miller management called a meeting with stewards from the machinists' and electricians' unions. Stewards Treichel and Szewczuga were present for the electricians.[8] Company officials informed the stewards that the company had decided to assign certain disputed work to the machinists, although the work had previously been assigned to an outside group of electricians.[9] The representatives of both unions responded to the announcement with heated displeasure, and said that it might produce "trouble," in the sense of employee dissatisfaction. Neither the company officials nor the union officials foresaw at this time that the decision might prompt any interruption of work.[10] Stewards Szewczuga and Treichel, after leaving the meeting, informed a higher union official, Henry Carrera, of the company's decision, and proceeded to their respective shops to inform the rank and file.[11]

Steward Treichel received an angry response from his fellow electricians: they expressed dissatisfaction with their union and their stewards and threatened to leave

---

1. Sections 8(a)(1) and (3), 29 U.S.C. §§ 158(a)(1), (3), provide, in pertinent part:
   (a) *Unfair labor practices by employer*
   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   . . . .
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

2. This court has jurisdiction under 29 U.S.C. §§ 160(e) & (f).

3. Miller Appendix ("App.") at 2.

4. *Id.* at 3–5.

5. *Id.* at 21–49.

6. *Miller Brewing Co.*, 254 N. L. R. B. No. 24 (1981), App. at 7–20.

7. The findings of the ALJ are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See infra* part III A.

8. App. at 28.

9. *Id.* at 27–28.

10. *Id.* at 28–29.

11. *Id.* at 29.

work to go to the union hall.[12] Treichel called union representative Carrera again to inform him of the threatened work stoppage. Carrera advised Treichel to try to keep the men at work while Carrera attempted to discuss the situation with Miller officials, and to keep the men together as a group if Treichel was unable to prevent the electricians from going to the union hall.[13] Treichel attempted to persuade the men in his shop that leaving work would be the wrong thing to do. After leaving the shop for a short meeting with steward Szewczuga and a third steward, Ted Collins, Treichel returned to his shop and found that the rank and file had firmly decided to leave work despite Treichel's admonitions. Treichel then sought out a Miller supervisor and informed him of the impending walkout, and said that he, Treichel, would have to accompany the men.[14] Treichel was the first of the electricians in his shop to punch out, but he was the last to leave.[15] At no time did he direct anyone to stop work or to leave the plant.[16]

Steward Szewczuga found the electricians in his shop equally irate. The men accused the stewards and the union of failing to do their job. Szewczuga responded that the stewards were doing their best, and told the men that union representative Carrera would take the proper action regarding the work-assignment decision.[17] After a meeting with the other two electrician stewards, Szewczuga was returning to his shop when he received a telephone call; an anonymous caller told Szewczuga that the electricians were going to the union hall and that they wanted the stewards to be there.[18] When he reached the shop, Szewczuga found the men dressed in street clothes and ready to leave work. Szewczu-

ga attempted to dissuade them from leaving, and asked that they stay at work at least until representative Carrera had had an opportunity to file an official grievance regarding the work-assignment decision. The men responded that they no longer believed in grievances.[19] Szewczuga tried unsuccessfully to reach Treichel and Carrera by telephone; he then determined that he should accompany his men to the union hall. While he was preparing to leave, two Miller officials confronted Szewczuga and warned him that a walkout would be a violation of the contractual no-strike clause, and that the participants might face discipline, including discharge. Szewczuga responded that he understood, but that he was unable to dissuade the men from leaving and that they wanted their steward at the union hall. Szewczuga punched out and was the last electrician to leave his shop. He did not direct any employee to leave the plant, and did not countermand any supervisor's order to remain at work.[20]

In a third shop, steward Collins and his group were the last electricians to learn of the work-assignment decision. Collins learned of the decision from Szewczuga and Treichel, and informed the men in his shop. The men reacted just as those in Szewczuga's and Treichel's shops had: they angrily resolved to leave work and go to the union hall to get an explanation of the work-assignment decision. Collins informed his supervisor that he was unable to persuade the men to remain at work, and that he intended to go with the men to keep order.[21] The supervisor called higher management officials, one of whom in turn called union representative Carrera, who came to the plant. Carrera met first with the Miller officials, and then with the men in Collins's

12. One reason for the strong reaction of the electricians to the news of this work-assignment decision was that the electricians had lost similar work-assignment disputes to the machinists in the past. App. at 25–26.

13. App. at 29.

14. *Id.* at 30.

15. *Id.* at 32.

16. *Id.* at 30, 31.

17. *Id.* at 33.

18. *Id.* at 33–34.

19. *Id.* at 34.

20. *Id.* at 34–35.

21. *Id.* at 36.

shop; Carrera was able to persuade the men to remain at the plant.[22]

After he succeeded in persuading the men in Collins's shop not to leave the plant, Carrera went to the union hall and met with the strikers from Szewczuga's and Treichel's shops. Carrera informed them that he had agreed with management upon a procedure by which the work-assignment dispute would be submitted to the NLRB, and that he had received tentative assurances from management that the punishment for the walkout would be mild. Carrera, with the aid of stewards Szewczuga and Treichel, who spoke in favor of the proposed solution, persuaded the men to return to work the next day.[23]

The work stoppage by the electricians in the three shops, all parties agree, was in violation of Article IX of the collective bargaining agreement between Miller and the electricians. Paragraph 5 of Article IX provides, in pertinent part:

> During the term of this Agreement, all disputes, grievances, complaints and adjustments pursuant to this Agreement shall be settled in accordance with the Grievance and Arbitration Procedure outlined herein, and the Union agrees for itself and its members that there shall be no strike of any kind, walk-out, slowdown, picketing, stay-in, or work stoppage of any type. Should the Union, or any employee or group of employees violate the provisions of this paragraph, it is mutually agreed that the Employer may impose such disciplinary action against any or all employees involved as it may deem necessary, including discharge.

App. at 25.

On November 15, 1977, after conducting an investigation,[24] Miller announced three levels of discipline for the participants in the November 1 work stoppage. First, the electricians in steward Collins's shop, who stopped work for three hours but stayed at the plant, received written reprimands and the loss of three hours' pay; Collins was docked for three hours' pay but received no reprimand. Second, the electricians in Szewczuga's and Treichel's shops who left the plant received reprimands and suspensions for three days without pay. Finally, stewards Szewczuga and Treichel—veteran employees of Miller with 26 and 12 years of service respectively—who accompanied the rank-and-file electricians on the walkout, were discharged, because of "participation in and leadership of" the walkout.[25]

When steward Collins, the only steward not discharged by Miller, learned of the discharges of Szewczuga and Treichel, he resigned as steward. Since then, union representative Carrera has been unable to persuade any of the electricians at the plant to serve as stewards.[26]

## II. THE ADMINISTRATIVE PROCEEDINGS

Having made the findings that we have just summarized, the ALJ first considered and rejected Miller's contention that Treichel and Szewczuga had been discharged because they were leaders of the strike.[27] He further rejected the contention that Miller officials had a good faith belief that the two were leaders, even if they were not leaders in fact.[28] Instead, he concluded, Miller officials had equated stewardship with leadership of the strike.[29] The ALJ found no evidence in the record to suggest that the parties to the collective bargaining agreement had agreed that union officials were to be held to higher responsibilities than the rank and file during unauthorized strikes.[30] Under existing Board precedent,

22. *Id.* at 36–38.

23. *Id.* at 38–39.

24. *See infra* pp. 968–969.

25. App. at 40.

26. *Id.* at 42.

27. *Id.* at 43.

28. *Id.*

29. *Id.* at 42.

30. *Id.* at 45.

he concluded, the selective discharge of the two stewards was an unfair labor practice.[31] His recommended order directed Miller to cease similar violations of the Act in the future, to offer to reinstate Szewczuga and Treichel with back pay from the date of their discharge, and to post appropriate notices.[32]

A divided panel of the Board affirmed the ALJ's findings and conclusions, although it modified the ALJ's remedial order in one respect.[33] Instead of ordering full back pay from the date of the discharge of the two stewards, as the ALJ had recommended, the Board ordered back pay for the period by which the discipline given the stewards exceeded the discipline given to the rank and file.[34] This reduced the amount of back pay ordered by three days. Chairman Fanning explained that such a

reduction was necessary to tailor the relief to the violation found.[35]

We now proceed to a consideration of the contentions made in the petitions for review.

### III. Miller's Challenges To The Board's Order

#### A. *Strike Leadership*

██ Miller presents two arguments concerning the stewards' alleged leadership of the strike: first, that the stewards were in fact leaders of the work stoppage,[36] and second, that discharge of the two stewards was permissible because Miller officials had a good faith belief that the two were leaders, even if they were not so in fact.[37] Both arguments lack merit.

---

**31.** *Id.* at 44–46. *See, e.g., Precision Castings Co.,* 233 N. L. R. B. 183 (1977). The rule announced in *Precision Castings* has had a mixed reception in the courts of appeals. *See Fournelle v. NLRB,* 670 F.2d 331, 338–40 (D.C. Cir.1982), and cases cited there.

**32.** App. at 47–48.

**33.** 254 N. L. R. B. No. 24; App. at 7–20. Chairman Fanning wrote for the majority. Member Jenkins concurred, but stated that he would not have reduced the back pay ordered by the ALJ by three days. App. at 15–17; *see infra* part IV. Member Pennello dissented on the ground that the stewards, as union officials, "had a higher duty than other employees to abide by and enforce the contractual no-strike provision." App. at 17–19.

Both the ALJ and the Board sought to distinguish *Indiana & Michigan Elec. Co. v. NLRB,* 599 F.2d 227 (7th Cir. 1979). The *Indiana & Michigan* decision denied enforcement of a Board order that found it a violation of the Act for an employer to impose disparate discipline on union officials who participated in, but did not lead, an unauthorized work stoppage. The ALJ noted that the collective bargaining agreement in *Indiana & Michigan* imposed special duties on union officials during unauthorized strikes, while the agreement between Miller and the electricians did not. App. at 45 & n.15. The Board did not disapprove this reasoning, but was apparently troubled by certain language in the *Indiana & Michigan* decision suggesting that union officials have a "higher responsibility that accompanies [their] status," 599 F.2d at 230. The Board in this case thus added the additional argument that, even assuming that union officials may have such

higher responsibilities as a result of their status alone, the conduct of stewards Treichel and Szewczuga was sufficient to discharge such responsibilities. *See* App. at 11.

The *Indiana & Michigan* case has been clarified by later decisions. The Seventh Circuit, in *C. H. Heist Corp. v. NLRB,* 657 F.2d 178, 182–83 (7th Cir. 1981), has interpreted *Indiana & Michigan* to require some contractual basis for a union official's higher responsibilities. The Third Circuit in *Metropolitan Edison Co. v. NLRB,* 663 F.2d 478, 482 n.1 (3d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982), has disapproved the *Indiana & Michigan* case insofar as it suggests that union officials may be selectively disciplined even if there is no collectively bargained authorization for such punishment. This court's decision in *Fournelle v. NLRB,* 670 F.2d 331 (D.C. Cir.1982), holds that an arbitral decision may be the source of higher responsibilities for union officials but does not hold that a union official's status alone may justify disparate punishment.

We do not address the Board's attempts to provide an additional distinction of the *Indiana & Michigan* case. The ALJ's distinction, based upon the absence of collectively bargained higher duties in this case, is sufficient. *See infra* part III B.

**34.** App. at 7–8 n.1.

**35.** *Id.* at 11–14. *See infra* part IV.

**36.** Miller Br. at 17–22.

**37.** *Id.* at 22–25.

As this court noted in *Fournelle v. NLRB*, 670 F.2d 331 (D.C.Cir.1982), "Board precedent is clear that union officials who are strike leaders may be selectively punished." *Id.* at 340 n.18 (citing *Chrysler Corp.*, 232 N. L. R. B. 466 (1977); *J. P. Wetherby Constr. Co.*, 182 N. L. R. B. 690 (1970)). Strike leadership has been defined so as to include not only the initial incitement of a work stoppage, *see, e.g., NLRB v. Armour-Dial, Inc.*, 638 F.2d 51, 56 (8th Cir. 1981), but also actions giving "impetus and direction" to a strike. *Chrysler Corp., supra*, 232 N. L. R. B. at 474 (decision of ALJ).

Miller contends that the actions of stewards Szewczuga and Treichel constituted leadership of the walkout, because they "provided this 'spontaneous' walkout a certain order that was otherwise lacking." [38] Miller points to testimony in the record that the two stewards tried to keep order at the beginning of the meeting in the union hall,[39] that Szewczuga was requested to accompany his men to the union hall,[40] that the two stewards advised against including electricians on the second shift in the walkout, and that the two stewards did not immediately seek the assistance of management officials in ending the walkout.[41] All of this testimony, however, is consistent with the conclusion of the Board that "[t]he leadership which was exerted by Treichel and Szewczuga was not in causing the walkout, but rather in a futile attempt to quell the rising tide favoring the walkout." [42] Miller concedes that the stewards did not initiate the walkout.[43] To the extent that the stewards helped to keep the walkout orderly, they helped to bring about its speedy conclusion. Although they were not in close contact with management officials, they did contact Carrera, a higher union official, who advised them to stay with their men;[44] Carrera then worked with management officials to limit the walkout to half a day's duration.[45] Miller's nonspecific assertion that neither steward "made a significant effort to deter any individuals from walking out" [46] is rebutted by credited testimony. Miller's arguments about strike leadership reduce, at bottom, to the proposition that the stewards "assumed a natural role of responsibility in ensuring that the walkout was orderly"; [47] this argument essentially equates leadership with stewardship, and we reject it, just as the Board did.[48] The Board's conclusion that the stewards were not strike leaders is supported by substantial evidence, and we affirm it.[49]

■ Miller's second argument is that, even if the stewards were not in fact the leaders of the strike, Miller officials had a good faith belief that they were leaders, and so were entitled to discharge them. This argument fails in its initial premise: Miller officials did not have such a good faith belief. The management officials who conducted the post-strike investigation testified that they had no direct knowledge that the two stewards had incited or encouraged the walkout.[50] Instead, as the Board found, those officials treated the stewards as leaders simply because they were stewards.[51] Manager Jablonowski testified that he believed that the two were leaders simply because they had joined the walkout; [52] Manager Paulicivic testified that he assumed that because the stewards

---

**38.** *Id.* at 19.

**39.** *Id.*; App. at 135.

**40.** Miller Br. at 19; App. at 163.

**41.** Miller Br. at 20; App. at 182.

**42.** App. at 11.

**43.** Miller Br. at 22.

**44.** App. at 29.

**45.** *Id.* at 38–39.

**46.** Miller Br. at 22.

**47.** *Id.* at 22.

**48.** App. at 43.

**49.** *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**50.** App. at 41.

**51.** *Id.* at 41–42.

**52.** *Id.* at 41.

had transmitted the work-assignment decision to the rank and file, and because a strike had resulted, the stewards must have transmitted the decision "in such a way as to cause the walkout."[53] The Miller official who approved the discharges, Daniel Feinsinger, conceded in his testimony that the discharges were based upon the "obvious consideration that they were stewards."[54] The ALJ's finding, that Miller "acted on an assumption or belief, without foundation in and contrary to the fact,"[55] was supported by substantial evidence.[56]

### B. *Selective Discipline as an Unfair Labor Practice*

We have concluded that Szewczuga and Treichel did not lead the strike, and their discharges therefore cannot be justified on that basis. We now turn to Miller's attacks on the Board's interpretation of sections 8(a)(1) and (3). The Board determined that the collective bargaining process had not explicitly established higher duties for union officials during unauthorized strikes, and that in the absence of such explicit duties, selective discipline of the union officials was an unfair labor practice.[57] We affirm the Board's conclusion.

### 1. *Duties under the collective bargaining agreement*

In *Fournelle v. NLRB*, 670 F.2d 331 (D.C. Cir.1982), this court held that "where the collective bargaining process has imposed higher duties upon union officials than the rank and file, the officials may be more harshly punished than the rank and file for their conduct in violation of the no-strike clause and an employer's selective discipline of the offending union official will not constitute an unfair labor practice." *Id.* at 341. *Fournelle* did not reach the question whether selective discipline could be an unfair labor practice if there were no such collectively bargained higher duties, and if the union official did not lead the unprotected strike. *Id.* at 338.[58]

The ALJ noted, and Miller does not contest,[59] that the no-strike clause of the collective bargaining agreement between Miller and the electricians "has no special undertaking that could be said to place a special or specific duty upon the stewards in connection with forbidden work stoppages. It simply provides that the Union agrees for itself and its members that there shall be no (forbidden) work stoppage."[60] This is what the court in *Fournelle* referred to as a "neutral" or "general" no-strike clause,[61] and hence is an insufficient waiver under *Fournelle*.

In *Fournelle*, the parties' permanent umpire had clearly interpreted the parties' collective bargaining agreement as imposing

---

**53.** *Id.*

**54.** *Id.* at 42.

**55.** *Id.* at 43.

**56.** *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Because we find that the record supports the ALJ's conclusion that Miller lacked a good faith belief that the stewards were leaders, we need not address Miller's attempt to distinguish *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), in which the Supreme Court held that an employer may not discharge an employee for a good faith but mistaken belief that the employee has engaged in misconduct, if the employee was engaged in protected activity. Because the stewards were engaged in an unprotected strike, Miller argues, the principle of *Burnup & Sims* is inapplicable, and a good faith belief in the stewards' leadership suffices to justify the discharge. *See*

*Complete Auto Transit, Inc.*, 134 N.L.R.B. 652 (1961). Were we to reach this argument, we would reject it because, as we conclude *infra* part III B, the discharges constituted impermissible discrimination against the protected right to seek and hold union office.

**57.** *See supra* note 33.

**58.** The court noted in *Fournelle*, though, that selective discipline in such circumstances "may run afoul of sections 8(a)(1) and (3)," and cited the Third and Seventh Circuit cases upon which we rely here to enforce the Board's order. *Fournelle, supra*, 670 F.2d at 338 & n.15.

**59.** Miller Br. at 32 n.17.

**60.** App. at 45.

**61.** 670 F.2d at 338.

higher duties on union officials. We held that such a clear arbitral decision should be given effect as the authoritative interpretation of the agreement. The Board had therefore erred in ignoring the arbitrator's decision and concluding that the selective discipline of a union steward who participated in an unauthorized strike was an unfair labor practice.[62]

Miller noted at the hearing before the ALJ that an arbitrator had upheld the discharges of Szewczuga and Treichel; Miller did not make the arbitrator's decision a part of the administrative record, however. Nor, as the ALJ noted, did Miller "raise [the arbitral] result, or deferral to the arbitration, as a defense."[63] The decision in *Fournelle* was handed down after the conclusion of the administrative proceedings in this case, and indeed after the conclusion of the normal briefing of this case.[64] The question is what effect, if any, we should now give to the arbitrator's decision, in light of the intervening decision in *Fournelle.*

It is plain that we cannot simply decide at this point that the collective bargaining agreement should be interpreted to impose higher duties on union officials. The court in *Fournelle* stated that an arbitral decision, in order to be controlling, must provide a "clear indication of the meaning of the agreement."[65] There is no indication on the present record whether the arbitrator's award was sufficiently clear, or indeed if it rested on the ground that the collective bargaining agreement imposed higher duties on union officials.[66]

Miller requests, however, that this court remand these proceedings to the Board so that the arbitral decision can be placed in the record and considered by the Board in light of *Fournelle.* The Board and the stewards oppose this request, contending that section 10(e) of the Act, 29 U.S.C. § 160(e), precludes such a remand. Section 10(e) provides in pertinent part:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.... If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings ... and shall file its recommendations, if any, for the modification or setting aside of its original order.

Section 10(e) requires that we ask two questions: (1) was there a failure to raise an "objection" based upon the arbitrator's decision, and (2) was any such failure excused because of "extraordinary circumstances"? If the objection was raised, or if failure to raise it was excused because of extraordinary circumstances, then we may consider whether additional *evidence* relevant to the objection should be adduced before the Board.[67]

62. *Id.* at 341–45.

63. App. at 42 n.13.

64. At oral argument, we directed the parties to file memoranda addressing the effect of the *Fournelle* decision on this case.

65. 670 F.2d at 343 n.21.

66. Miller's mention of the arbitrator's award in its brief states that the arbitrator determined "that the discharges were not contrary to the provisions of the collective bargaining agreement." Miller Br. at 14. The simple determination that the agreement does not *forbid* selective discipline would be insufficient to bring the case within the rule of *Fournelle* because, as we discuss below, without a valid waiver of union officials' rights to escape selective discipline, the Act itself forbids such selective discipline.

67. *Cf. NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 234–35, 67 S.Ct. 756, 764, 91 L.Ed. 854 (1947) ("The power to adduce additional evidence granted to the Circuit Court of Appeals by § 10(e) cannot be employed to enlarge the statutory scope of judicial review.").

■ The argument that the arbitrator's decision might provide evidence of the meaning of the collective bargaining agreement was not raised before the Board. Miller contends that, because it argued before the Board in general terms that the stewards' discipline was contractually authorized, the argument based upon the arbitral award is not a new "objection" within the meaning of section 10(e).[68] We disagree. As this court stated in *Consolidated Freightways v. NLRB*, 669 F.2d 790 (D.C. Cir.1981), the "critical inquiry" in determining whether an objection has been presented to the Board for purposes of section 10(e) is "whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal." *Id.* at 794. In this case it is apparent that Miller gave the Board no hint that it considered the arbitral decision relevant to the question of contractual interpretation, or that the issue might be pursued on appeal.[69]

Since the objection was not raised, the next question is whether failure to raise it was "excused because of extraordinary circumstances." Miller argues that this court's decision in *Fournelle*, announced shortly before oral argument in the present case, constitutes an extraordinary circumstance.[70] Again, we disagree. The courts of appeals have generally held that intervening decisional law that suggests to a party a new ground for objection to a Board order is not an extraordinary circum-

stance within the meaning of section 10(e). *See, e.g., NLRB v. Newton-New Haven Co.*, 506 F.2d 1035 (2d Cir. 1974); *NLRB v. Pinkerton's National Detective Agency*, 202 F.2d 230 (9th Cir. 1953).[71] Miller relies on the Fifth Circuit's decision in *NLRB v. Robin American Corp.*, 667 F.2d 1170, 1171 (5th Cir. 1982), in which the court held that an intervening Supreme Court decision that overruled a "previously controlling" Fifth Circuit doctrine was an extraordinary circumstance justifying remand. The court noted, however, that it reached this result only because, at the time of the administrative proceedings, it would have been "futile, if not frivolous" to present an appropriate objection, given the previously controlling Fifth Circuit precedent.[72] The court suggested that the simple pronouncement of an intervening "new doctrine" would not constitute an "extraordinary circumstance" under section 10(e), and cited the *Newton-New Haven* and *Pinkerton's* cases, *supra*, for comparison.[73]

It is apparent that the present case is quite different from the *Robin American* case. The *Fournelle* decision did not overrule any previously controlling precedent that would have made an objection based on the arbitrator's award futile or frivolous. *Fournelle* holds that certain arbitral awards must be given effect as the authoritative interpretation of the no-strike clause. But the Board has had, since *Spielberg Mfg. Co.*, 112 N. L. R. B. 1080 (1955), a policy of deferral to arbitration awards in appropri-

---

**68.** Miller Supp. Mem. at 4–5.

**69.** *See Building Material & Constr. Teamsters Union Local 216 v. NLRB*, 520 F.2d 172, 179 n.8 (D.C.Cir.1975).

**70.** Miller Supp. Mem. at 9.

**71.** In the *Newton-New Haven* case, the Second Circuit was asked to remand the proceedings to the Board for reconsideration in light of an intervening Second Circuit case, which held that procedures like those used by the Board in *Newton-New Haven* were invalid. The procedural objection had not been raised before the Board. The court held that the intervening decision was not an extraordinary circumstance within the meaning of section 10(e). 506 F.2d at 1038.

In the *Pinkerton's* case, the Ninth Circuit held that its own intervening decision regarding the validity of certain contract terms, a decision under whose rule the Board in *Pinkerton's* should perhaps have reached the opposite result, was not an extraordinary circumstance justifying remand, when an appropriate objection had not been presented to the Board. 202 F.2d at 232–33.

*See also NLRB v. Good Foods Mfg. & Processing Corp.*, 492 F.2d 1302, 1305–06 (7th Cir. 1974); *Cascade Employers' Ass'n v. NLRB*, 404 F.2d 490 (9th Cir. 1968). *But cf. NLRB v. Lundy Mfg. Corp.*, 286 F.2d 424, 426 (2d Cir. 1960) (dictum).

**72.** 667 F.2d at 1171.

**73.** *Id.*

ate circumstances. *See Banyard v. NLRB*, 505 F.2d 342 (D.C.Cir.1974). Miller might have argued for such deferral in this case, but did not do so. Such an attempt would clearly not have been futile or frivolous, even if *Fournelle* might now improve its chances of success. We conclude that Miller's failure to present an objection based on the arbitral award was not excused by extraordinary circumstances, and therefore we refuse to consider that objection now, and decline to remand to the Board.[74] We therefore proceed to decide this case on the record before us.[75]

### 2. *Selective discipline under the NLRA*

■ As we have already noted, the record contains no evidence that the collective bargaining process has imposed any special duties on union officials or that it has provided for selective discipline of union officials who engage in unprotected strikes. Instead, the collective bargaining agreement contains only a general no-strike provision stating that "the Union agrees for itself and its members that there shall be no strike of any kind," and that, in the event of a forbidden strike, "the Employer may impose such disciplinary action against any or all employees involved as it may deem necessary, including discharge."[76] It is well established that an employer may discipline any or all of the participants in a contractually forbidden strike, as long as the discipline does not impermissibly discriminate against the employees' exercise of the rights protected by section 7 of the Act, 29 U.S.C. § 157.[77] *See Fournelle, supra*, 670 F.2d at 335–36 and cases there cited. The collective bargaining agreement between Miller and the electricians recognizes this general employer's prerogative. The question in the present case, however, is whether the *selective* discipline of union officials, without explicit collectively bargained authorization for that selective discipline, discriminates against the exercise of section 7 rights so as to violate sections 8(a)(1) and (3) of the Act. The Third and Seventh Circuits have addressed this question, and have held that such selective discipline violates the Act.

In *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478 (3d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982), the court began with the indisputable premise[78] that the right to hold union office "is the essence of protected union activities," *id.* at 482 (citing *General Motors Corp.*, 218 N.L.R.B. 472, 477 (1975), *enforced mem.*, 535 F.2d 1246 (3d Cir. 1976)). The exercise of this right, the court reasoned, would be unreasonably restricted by allowing an employer the right unilaterally to impose selective discipline on union officials who participate in unprotected strikes:

**74.** Our refusal to consider Miller's untimely objection and our refusal to remand are based upon the special limitations on judicial review that Congress enacted in section 10(e), limitations that have been strictly interpreted. *See, e.g., NLRB v. Cheney California Lumber Co.*, 327 U.S. 385, 388–89, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946). Different considerations may be controlling in other contexts. *Compare, e.g., United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952), *with Hormel v. Helvering*, 312 U.S. 552, 558-59, 61 S.Ct. 719, 722, 85 L.Ed. 1037 (1941).

**75.** In enacting section 10(e), "Congress has said in effect that in a proceeding for enforcement of the Board's order the court is to render judgment on consent as to all issues that were contestable before the Board but were in fact not contested." *NLRB v. Cheney California Lumber Co.*, 327 U.S. 385, 389, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946).

**76.** App. at 25.

**77.** Section 7 provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

**78.** *See Radio Officers' Union v. NLRB*, 347 U.S. 17, 39–40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954).

Allowing the discriminatory punishment that the Company imposed on [the union officers] might deter others from seeking union office because of the fear that, if an illegal strike were to occur, they would be put into an untenable position: either obey the company and lose their authority, or follow their own judgment and risk harsher punishment. It is because of this dilemma that we will not interpret a collective bargaining agreement to impose additional responsibilities on union officials absent clear language showing that the union agreed to it.

663 F.2d at 482–83 (footnote omitted). Therefore, the court held, the employer had violated the Act by giving disparately harsh suspensions to two stewards who refused to cross a picket line established by rank-and-file employees in violation of the no-strike clause.[79]

Similarly, in *C. H. Heist Corp. v. NLRB*, 657 F.2d 178 (7th Cir. 1981), the court held it "inherently destructive" of union members' rights to seek and hold union office for the employer to single out for discharge a union steward in the wake of an unprotected strike, when the collective bargaining agreement contained no provision of "higher responsibilities" for union officials during such strikes, and when the steward had sought to dissuade the other strikers.[80]

We find the reasoning of the courts in the *Metropolitan Edison* and *C. H. Heist* cases persuasive.[81] The selective discipline of union officials who are under no collectively bargained duty to take special measures to end unauthorized strikes may deter employees in the exercise of their protected right to seek and hold union office. We note, without resting our decision on the point,[82] that Miller's discharge of stewards Szewczuga and Treichel has had just such a destructive effect on employee rights: after the announcement of the discharges, steward Collins resigned his union post, and since then the union has been unable to persuade any of its members to serve as stewards.[83] The right of union officials to be free from selective discipline for participation in unauthorized strikes may be waived, *Fournelle, supra*, 670 F.2d at 338–41, but that does not mean that an employer may unilaterally increase the burdens associated with the holding of union office. Therefore we hold that an employer violates the Act by punishing union officials more harshly than the rank and file for their simple participation in conduct in violation of the no-strike clause, when the collective bargaining process[84] has imposed no special responsibilities or liabilities on union officials.

**79.** The court stated that its holding was consistent with its earlier decision in *Gould Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), which held that union officials could be more harshly punished for participation in unprotected strikes if the collective bargaining agreement required those officials to take positive steps to help end such strikes. 663 F.2d at 482. *See also Hammermill Paper Co. v. NLRB*, 658 F.2d 155 (3d Cir. 1981).

**80.** The court distinguished its earlier decision in *Indiana & Michigan Elec. Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979), which had upheld an employer's selective discipline of union officials; the distinction rested on the ground that in the previous case there was a contractual basis, albeit a "tenuous" one, for the imposition of higher responsibilities on stewards. 657 F.2d at 182. *See supra* note 33.

**81.** *Fournelle* disapproved the Third Circuit's conclusion in *Metropolitan Edison* that past arbitral awards cannot furnish a present indica-

tion of the meaning of the collective bargaining agreement unless the agreement explicitly provides that arbitral awards will be precedentially binding. *Compare Fournelle*, 670 F.2d at 343–45, *with Metropolitan Edison*, 663 F.2d at 483–84. That portion of *Metropolitan Edison* disapproved by *Fournelle* is irrelevant here.

**82.** *See Radio Officers Union v. NLRB*, 347 U.S. 17, 51, 74 S.Ct. 323, 341, 98 L.Ed. 455 (1954) ("subjective evidence of employee response" to employer discrimination is not required "where encouragement or discouragement can be reasonably inferred from the nature of the discrimination").

**83.** App. at 42.

**84.** The term "collective bargaining process" is used here in the sense that the *Fournelle* court gave it, to include certain arbitral results as well as the terms of the collective agreement reduced to writing.

## IV. THE STEWARDS' CHALLENGE TO THE BOARD'S ORDER

The two stewards, who substantially prevailed before the Board, challenge only one aspect of the Board's order: they claim that the Board erred in refusing to award them full back pay to the date of their discharge. They argue that, because the Board found that "these two stewards could have done little else but what they did," the two stewards were not properly subject to *any* punishment, and that it was therefore inconsistent for the Board to limit the back pay remedy to the period by which the two stewards' discipline exceeded the three-day suspensions given to the other strikers.[85]

The simple answer to this argument is the one given by Chairman Fanning in his opinion for the Board: the Board's remedy wholly redresses the two stewards for that portion of the discipline that the Board found illegal.[86] The two stewards left work; in so doing they engaged in unprotected activity. The two stewards' attempts to persuade their fellow workers to stay at work did not make their own departure from work protected activity. They were thus subject to discipline, as long as that discipline was not imposed in a manner that discriminated against the exercise of the protected right to seek and hold union office. The Board, "in the exercise of its informed discretion," is entitled to deference in its use of the back pay remedy, "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). We find no reason to disturb the Board's order.

## V. CONCLUSION

For the reasons set forth above, we enforce the Board's order in all respects. We reject Miller's contentions that the two stewards were strike leaders, that Miller believed in good faith that they were strike leaders, and that the Act permits the selective discharge of union officials in circumstances like these. We further reject the stewards' contention that the Board erred in failing to award them full back pay to the date of their discharge.

*It is so ordered.*

---

**85.** Szewczuga-Treichel Br. at 23–25.

**86.** App. at 11–14.